# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

ROBERT DENT

v.

WEXFORD HEALTH SOURCES, INC.

Civil Action No. CCB-15-206

## MEMORANDUM OPINION

Robert Dent has complained to medical staff at Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland, and Western Correctional Institution ("WCI") in Cumberland, Maryland,[1] as well as to Wexford Health Sources, Inc. ("Wexford"), the medical contractor for the Maryland Department of Public Safety and Correctional Services ("DPSCS"), about pain in his left knee and lower back. He has filed suit under 42 U.S.C. § 1983, alleging that Wexford, along with Janice Gilmore, Colin Ottey, M.D., Peggy Mahler, R.N.P., and Robustiano Barrera, M.D., violated his rights under the Eighth Amendment to the United States Constitution by providing him inadequate medical treatment.

Pending is the defendants' motion to dismiss or, in the alternative, motion for summary judgment. (Mot. Dismiss, ECF No. 18.) Dent has filed an opposition, (Resp. Opp'n, ECF No. 22), to which the defendants have replied, (Reply, ECF No. 25). The case is fully briefed and ripe for disposition.[2] No hearing is necessary to resolve the issues. *See* Local Rule 105.6 (D. Md. 2014).[3] For the reasons that follow, the defendants' motion will be granted in part and denied in part. The claims against Wexford and Gilmore will be dismissed; summary judgment will be

---

[1] Dent was incarcerated at RCI from 2008 to 2012. (Dent Aff. ¶ 1, ECF No. 22-2.) In 2012, he was transferred to WCI. (*Id.*) Dent was transferred from WCI back to RCI on March 30, 2015. (Sealed Ex. 1 128, ECF No. 19-2.)

[2] This case has been transferred to the undersigned because of a temporary imbalance in workload.

[3] Dent has filed a motion to appoint counsel, (ECF No. 23), which will be denied because he demonstrates no exceptional circumstances at this time to warrant appointment of counsel. *See* 28 U.S.C. § 1915(e)(1); *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975).

granted as to Mahler and Barrera; and summary judgment will be denied without prejudice as to Ottey, subject to renewal in sixty days.

## BACKGROUND

Dent is an inmate in the custody of DPSCS. (Compl. 1, ECF No. 1.) He filed this complaint in January 2015, raising an Eighth Amendment claim based on the medical care he received for his left knee and lower back pain. (*Id.* at 3-5.) He claims he was improperly denied arthroscopic surgery on his left knee and MRIs of his knee and lumbar spine after these procedures were recommended for him in 2014. (*Id.*) Dent claims the defendants were aware for three years that he had knee and lower back pain, yet failed to order MRIs. (*Id.* at 4.) As redress, Dent is seeking a declaratory judgment that the defendants violated his constitutional rights, injunctive relief ordering the defendants to provide him medical treatment, compensatory damages in the amount of fifty thousand dollars ($50,000) against each defendant, punitive damages in the amount of two-hundred-and-fifty thousand dollars ($250,000) against each defendant, and "daily disability compensation" of ninety dollars ($90) against each defendant. (*Id.* at 5-6.)

The following facts are presented in the light most favorable to Dent, the nonmoving party.[4]

### A.  Treatment History

On March 6, 2011, Dent presented concerns of pain in his leg and back to Ottey, the medical director of WCI and RCI. (ECF No. 1-11, at 1; Ottey Aff. ¶ 1, ECF No. 18-4.)[5] Dent explained that he had hurt his leg and back in a car accident in 1996. (ECF No. 1-11, at 1.)

On March 9, 2011, Dent was examined by Crystal Swecker, P.A., for knee and back

---

[4] The court granted the defendants' motion to place Dent's records under seal. (ECF No. 21.)
[5] Ottey's medical report indicates Dent complained of right leg, not left knee, pain. (*Id.* at 1.) Ottey indicated x-rays were ordered. (*Id.* at 3.)

pain.[6] (ECF No. 1-12, at 1.)  She reported finding that Dent had decreased lumbar mobility, and his spine was positive for posterior tenderness. (*Id.*)

On December 24, 2011, Dent was seen by Jonathan Thompson, M.D., for complaints of bilateral leg pain.  (ECF No. 22-8, at 1.)  Dent explained he was hit in the back playing basketball and his legs went numb, causing him to fall to the floor.  (*Id.*)  Dent complained the bottom of his feet were tender.  (*Id.*)  Dent was told to continue his medication regimen, which included aspirin and an anti-inflammatory, and to avoid work or yard activity that day.  (*Id.* at 1-2.)

On July 1, 2012, Wexford became the medical contractor for inmates in the custody of DPSCS.  (Ottey Aff. ¶ 2.)  Prior to this time, Wexford was responsible for utilization management review services for the DPSCS system, and did not directly treat inmates in the DPSCS system. (*Id.*)  As utilization review provider, Wexford was responsible solely for approving or denying specialty medical service for inmates.  (*Id.*)

The defendants assert that Dent raised no complaints of back or leg pain between July 1, 2012, and January 22, 2014.  (Mot. Dismiss Mem. Law 3, ECF No. 18-1.)  Dent's exhibits show that on August 22, 2013, Mahler saw Dent for a number of medical complaints, but none concerned lower back or left leg pain.  (ECF No. 1-15, at 1.)  On November 14, 2013, however, Dent presented complaints about intermittent left knee and mid-back pain to Mahler during a medical visit, which he attributed to arthritis. (ECF No. 1-16, at 1.)  Mahler indicated Dent was taking Motrin, which she advised him to continue.  (*Id.*)  She also recommended stretching exercises for him and told him to follow up with another appointment if needed.  (*Id.*)

The next time Dent complained of leg pain was at his medical appointment on January

---

[6] Swecker's report indicates Dent complained of right leg, not left knee, pain.  (ECF No. 1-12, at 1.)  Swecker noted Dent's x-rays showed no acute fracture, dislocation, or subluxation.  (*Id.*)

28, 2014. (ECF No. 1-17, at 1.)  Mahler evaluated Dent and indicated that Dent complained of suffering from pain in his *right leg* for six months.  (*Id.* (emphasis added).)  Dent described the pain as an ache that was worse in the morning and gradually improved throughout the day.  (*Id.*)  Dent stated he had arthritis, and described his pain as moderate.  (*Id.*)  Mahler noted that Dent's condition was stable and improved with NSAIDs.[7]  (*Id.*)  Mahler prescribed Naprosyn[8] and recommended stretching exercises.  (*Id.*)

On March 7, 2014, Ottey examined Dent for chest and right knee discomfort.  (Sealed Ex. 1, at 3-4.)  Ottey observed that Dent had no knee swelling, his gait was normal, and he was able to bear full weight.  (*Id.* at 3.)  Ottey instructed Dent to submit a sick call slip if his symptoms failed to improve.  (*Id.* at 4.)

On April 28, 2014, Mahler saw Dent for complaints of left knee and lower back pain. (ECF No. 1-18, at 1.)  Dent also noted "intermittent right knee pain," that his right knee gave out on him occasionally, and that the right-knee pain had improved with Motrin.  (*Id.*)  In terms of his left knee, he denied any surgery or injury.  (*Id.*)  Dent reported experiencing intermittent lower back pain, and that he felt a tingling sensation down his right leg when he jumped or reached straight up, which he attributed to a ball hitting him in the back while playing handball two years prior.  (*Id.*)  Dent stated he was supposed to begin physical therapy at RCI, but was transferred to WCI before it started.  (*Id.*)  Dent stated he believed he had a nerve issue in his back.  (*Id.*)  Mahler ordered x-rays of Dent's spine and knee. (*Id.* at 1, 3.)  The results of the spine x-ray showed mild degenerative changes, but no evidence of acute fracture or dislocation. (*Id.* at 4.)

---

[7] Nonsteroidal anti-inflammatory drugs (NSAIDs) are used to treat pain. *See* Pain Relievers, MedlinePlus, https://www.nlm.nih.gov/medlineplus/painrelievers.html (last updated March 9, 2016).
[8] Naprosyn is an NSAID. *See* Genentech, Medication Guide for Non-Steroidal Anti-Inflammatory Drugs (NSAIDs) 30 (2010), http://www.fda.gov/downloads/Drugs/DrugSafety/ucm085911.pdf.

On June 5, 2014, Barrera examined Dent for complaints about pain in his left leg and back. (ECF No. 1-21, at 1.) Dent reported pain shooting down his leg. (*Id.*) Barrera noted Dent's reported history of a 2011 sports injury to his back. (*Id.*) Dent reported that the injury had resulted in almost immediate weakness in both legs, and that he was taken to the emergency room. (*Id.*) Dent reported that his leg function gradually returned, but he continued to experience left leg pain. (*Id.*) Dent told Barrera that his back pain had since returned. (*Id.*) While lifting weights, Dent had momentarily lost control of both legs. (*Id.*) Barrera indicated Dent showed clinical symptoms of a herniated disc, and referred him for physical therapy. (*Id.*)

On June 15, 2014, Ottey saw Dent for medication concerns. (Sealed Ex. 1, at 10-11.) Dent reported that he was to be placed on a muscle relaxer, but it had not been ordered. (*Id.* at 10.) Dent indicated that he was scheduled to begin physical therapy the following Tuesday. (*Id.*) Ottey observed that Dent limped. (*Id.*) He advised Dent to see the provider who recommended a muscle relaxer. (*Id.*)

On June 30, 2014, Dent saw Mahler for his concerns that he had yet to receive the Baclofen[9] prescribed for him. (*Id.* at 12.) The pharmacy department informed Mahler that Dent would be added to the medication list that day. (*Id.*) Dent was so advised. (*Id.*)

On July 9, 2014, Barrera saw Dent for a scheduled provider visit to re-evaluate his need for ongoing physical therapy. (*Id.* at 13-14.) Dent reported "significant improvement" regarding his back and leg pain, although he presented complaints of left knee pain with tenderness. (*Id.*) Barrera noted that the symptoms were compatible with tendinitis. (*Id.*) Barrera also observed Dent's straight leg raising was mostly corrected. (*Id.*) Based on his medical findings, Barrera

---

[9] Baclofen is a medication prescribed for pain relief and to improve muscle movement. *See* Baclofen Oral, MedlinePlus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (last updated Feb. 24, 2016).

recommended Dent continue physical therapy. (*Id.*) Dent was approved for additional physical therapy. (*Id.* at 15.)

On July 30, 2014, Monica Stallworth, M.D., saw Dent for a chronic care visit related to his arthritis, among other issues. (*Id*. at 16-17.) Dent complained that NSAIDs made him ill. (*Id.* at 16.) Stallworth renewed Dent's medications and prescribed Tylenol No. 3.[10] (*Id.* at 17.) On August 1, 2014, Ottey discontinued the Tylenol No. 3 prescription and prescribed Tylenol Extra Strength for arthritis instead. (*Id*. at 18.)

On August 19, 2014, Dent was seen by Mahler for a physical examination. (*Id.* at 19-22.) Dent reported suffering pain in his left knee for one-and-a-half years, and that he had injured his left knee playing handball in 2011. (*Id.* at 19.) He stated "Dr. Steve"[11] told him he had injured the cartilage in his left knee. (*Id.*) Dent said he was getting physical therapy for his back and left knee. (*Id.*) Dent also reported that Tylenol 500 mg was ineffective, but stated he did not want to take Motrin or Naprosyn because they upset his stomach. (*Id.*) Mahler prescribed Mobic[12] and recommended avoiding exercises that placed pressure on the knee. (*Id.* at 19, 24.)

On August 27, 2014, Barrera examined Dent for complaints of knee and back pain. (*Id.* at 25.) Dent reported improvement with physical therapy. (*Id.*) Barrera noted tenderness, but no swelling in the left knee. (*Id.*) Barrera noted a possible meniscus tear in the left knee,[13] and possible degenerative disc disease in the spine. (*Id.*) Barrera increased Dent's Baclofen and recommended continuing physical therapy. (*Id.*)

---

[10] Tylenol No. 3 is a combination of Tylenol and codeine (an opiate) used to treat pain. *See* Tylenol with Codeine, DailyMed, http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=d4ed06cd-20a1-4b6d-ba8a-0a2a71e9a0ff (updated Dec. 7, 2010).

[11] The record does not reflect the date of this examination or the complete name of the medical provider.

[12] Mobic is an NSAID used to treat pain. *See* Medication Guide for Non-Steroidal Anti-Inflammatory Drugs (NSAIDs), http://www.fda.gov/downloads/Drugs/DrugSafety/ucm088646.pdf.

[13] "A torn meniscus is damage from a tear in the cartilage that is positioned on top of the tibia and allows the femur to glide when the knee joint moves." (Ottey Aff. ¶ 15.)

On September 18, 2014, Barrera ordered an MRI for Dent's continuing left knee pain. (*Id.* at 26.)   Noting Dent's reports were clinically consistent with a meniscus tear, Barrera ordered an orthopedic consultation with Roy Carls, M.D., an orthopedist practicing with Memorial Hospital Orthopedics.  (*Id.* at 26-27, 95; Mot. Dismiss Mem. Law 8 n.11.)

On September 26, 2014, Dent's non-formulary Mobic prescription was approved. (Sealed Ex. 1, at 28.)

On October 3, 2014, Carls examined Dent.  His report reads in part:

PHYSICAL EXAMINATION:    [Dent's] left knee reveals he does have tenderness very specifically in the posterior medial knee joint.  He otherwise has a stable ligamentous exam. Just by examining his knee this did exacerbate his sciatic symptoms with pain down the back of his leg with just a minimal leg raise.

DIAGNOSTIC STUDY:  X-rays of his left knee are unremarkable.

ASSESSMENT:  Left knee obvious medial meniscus tear.  He has now had this for about a year and a half.

PLAN: We discussed that knee arthroscopy of the left knee is indicated.  I will recommend surgery this can be done here at Western Maryland Health System as an outpatient procedure.  I also strongly recommend an MRI of his lumbar spine as likely he has a large disc and likely he will need referral to a spine surgeon for this but initially an MRI should be done for diagnosis.

(*Id*. at 107.) The same day, Jennifer Bruno, L.P.N., updated Dent's medical chart to reflect Carls's recommendations of arthroscopic surgery and an MRI of his back.  (ECF No. 1-3.)

Four days later, on October 7, 2014, Dent complained to Mahler that he had yet to receive the MRI.  (Sealed Ex. 1, at 31.)  Mahler indicated there was no order in Dent's electronic personal health record ("EPHR") for an MRI, and informed him that he had to wait until a note was sent from Carls's office.  (*Id.*)  Mahler wrote she would email the scheduler to request the orthopedic note from Carls.  (*Id.*)

On October 20, 2014, Barrera discussed the orthopedic consultation results with Dent. (*Id.* at 33-34.)  Noting that Carls had agreed with his diagnosis of a left meniscus tear and lumbar spinal disc disease, Barrera stated he would submit a request for MRIs of Dent's lumbar spine and left knee.  (*Id.* at 33.)

On November 4, 2014, Ottey prescribed a trial course of steroids for Dent and increased his Baclofen.[14]  (*Id.* at 35.)  Ottey ordered a follow-up appointment for Dent in two weeks.  (*Id.* at 35, 36.)  Ottey's notes from the medical appointment read in part:

> The patient present reported that he injured his back about two years ago while playing ball.  He reported that someone colloided [sic] with him on the court.  He reported that he has pain in the lower back. He has radiation of the pain to both lower extremities.
>
> ************
>
> He reported that he fell on his [left] knee while exercising. The injury occurred about one year ago.  He has stiffness in the knee.  He has locking of the knee. He has weakness in the left knee. He describes the pain as throbbing.  He has no locking of the knee.[15]  He has increase[d] pain with twisting, prolong[ed] walking. He had PT.  (*Id.* at 35.)

On November 17, 2014, Dent reported to Barrera that his left knee and lumbosacral spine pain were continuing.  (*Id.* at 37-38.)  Barrera noted the possibility of arthroscopic surgery, and that Dent would need an MRI of his left knee.  (*Id.* at 37.)  The two-week steroid course apparently proved ineffective.  (*Id.*)

On November 26, 2014, Dent submitted an Administrative Remedy Procedure ("ARP") request to the warden to complain that he had yet to receive MRIs on his knee or spine, or arthroscopic surgery on his knee.  (ARP Request 1-3, ECF No. 1-2.)   In ARP WCI 1769-14, Dent recounted the physicians' recommendations and stated he remained in extreme pain and could hardly walk some days.  (*Id.* at 2.)  Dent asked for MRIs of his knee and spine.  (*Id.* at 3.)

---

[14] It appears Ottey prescribed the two-week course of steroids to effectuate Carls's recommendation. (*See id.* at 37.)

[15] The opposing descriptions of Dent's knee as locking and not locking appear to reflect inadvertent typographical errors.

He also requested arthroscopic surgery on his left knee.  (*Id.*)  Additionally, he sought monetary damages.  (*Id.*)  Acting Warden Denise Gelsinger responded on December 18, 2014, stating:

> Your request for administrative remedy has been found meritorious. You were seen by the orthopedic surgeon on 10-3-14 who recommended left knee arthroscopy and an MRI of your lumbar spine. You were seen by a provider on 10-20-14 who generated a consult for an MRI of your left knee and lumbosacral spine. The consult was placed on hold pending review with the Regional Medical Director [RMD]. You were seen by the RMD on 11-4-14 who placed the consult on hold pending a 2 week trial of steroids. You were seen by a provider on 11-17-14 who documented that you [were] placed on steroids for 2 weeks to no avail. Your need for additional medical treatment has been brought to the attention of the RMD.

(*Id.* at 1.)

The record shows that on the previous day, December 17, 2014, Dent was approved for MRIs of his left knee and spine.  (ECF No. 22-5.)  The MRI of Dent's lumbar spine was performed on January 5, 2015.  (ECF No. 22-6.)  Robert F. Miller, M.D., reported that there was a small disc herniation on the right at the L1-L2 interspace, but no spinal canal stenosis.  (*Id.*)  Mild bulging was noted at the L4-L5 and L5-S1 interspaces.  (*Id.*)  Notably, although MRIs of the left knee and spine were approved, an MRI was performed on the lumbar spine only.  (*Id.*)

On January 7, 2015, Barrera met with Dent to discuss the MRI results.  (Sealed Ex. 1, at 51-52.)  Barrera indicated surgery was not needed and a conservative course of treatment would continue.  (*Id.* at 51.)  Dent complained he was suffering significant left knee pain, causing him to limp.  (*Id.*)  He also complained his left leg gave out frequently, especially when descending stairs.  (*Id.*)  Dent also reported the soft knee brace was not helpful.  (*Id.*)  Barrera requested an MRI of Dent's left knee, and indicated on the medical chart that another consultation with Carls may be needed.  (*Id.*)

On January 21, 2015, Barrera ordered a large knee brace for Dent.  (*Id.* at 54-55.)  Barrera saw Dent again the following day, January 22, 2015, in the chronic care clinic for several

health concerns, including back and knee pain.  (*Id*. at 56-58.)  Barrera recommended Dent continue taking his medication.  (*Id.* at 58.)

Dent presented his complaints of knee or back pain, or both, to medical providers again on February 11, 12, 16, 23; March 29; and April 9, 2015.  (*Id.* at 59-70.)  On February 12, 2015, Barrera ordered an MRI of Dent's left knee.  (*Id.* at 61-62, 101.)

On April 9, 2015, Don Elrod, P.A., ordered a left knee brace for Dent and placed him in the pain management chronic care clinic.  (*Id.* at 70.)  On April 13, 2015, Elrod submitted requests for an orthopedic evaluation of Dent's back, and an MRI of his left knee.  (*Id.* at 71, 103, 105.)

On May 11, 2015, Dent presented complaints of lower back pain and left knee pain.  (*Id.* at 72.)  He indicated Mobic was ineffective.  (*Id.*)  Elrod prescribed Gabapentin and ordered a cane for him.  (*Id.* at 72, 73, 74.)  Dent was issued a cane on May 18, 2015.  (*Id.* at 76.)

On June 2, 2015, Olusegun Lawoyin, M.D., submitted a request for Dent to be seen for a telemedicine review with Asresahegn Getachew, M.D., with regard to his left knee and back pain.  (*Id.* at 77-78; *see also* Ottey Suppl. Aff. ¶ 6, ECF No. 25-3.)  Lawoyin also requested an MRI of Dent's left knee.  (Sealed Ex. 1, at 77.)

On July 1, 2015, Maksed Choudry, M.D., saw Dent for his chronic pain.  (*Id.* at 79-82.)  Choudry placed a consultation request for Dent to be seen by Getachew.  (*Id.* at 79, 80, 82.)  Choudry renewed Dent's medications.  (*Id.* at 80-81.)

On July 7, 2015, Dent was approved for an MRI of his left knee. (*Id.* at 84.)

On July 26, 2015, Thompson examined Dent.  (*Id.* at 85-86.)  He observed Dent walked with a cane and a slight limp, but noted Dent did not appear to be in acute distress.  (*Id.* at 85.)  Dent reported that his knee and back pain were causing him to lose sleep, the pain was radiating

to both legs, and he could not perform some of his exercises.  (*Id.*)  Thompson indicated the medical notes "show patient has been waiting for MRI since 06/02/2015. Writer will refer back to provider to make sure MRI has been scheduled."  (*Id.*)

On July 28, 2015, Dent was sent to Bon Secours Hospital for an MRI of his left knee. (Ottey Aff. ¶ 43.)  A horizontal tear of the posterior horn of the medial meniscus was observed. (*Id.*)  Dent was referred to an orthopedist for further examination and development of a treatment plan. (*Id.*)

On August 25, 2015, Getachew saw Dent via a telemedicine conference and approved him for surgery to repair the torn left meniscus.  (Ottey Suppl. Aff. ¶ 6.)  Because the surgery was not of an emergency nature, it was scheduled according to prison policy for off-site medical visits and at the availability of the orthopedic surgeon.  (*Id.*)

On August 26, 2015, Choudry submitted a request for an orthopedic consultation to repair the meniscal tear.  (ECF No. 25-2.)  It was noted that Getachew had reviewed and approved the request.  (*Id.*)

On October 22, 2015, Dent underwent surgery on his left knee to repair a torn meniscus. (Dec. 2015 Dent Correspondence 1, ECF No. 28; Feb. 2016 Dent Correspondence 1, ECF No. 31.)[16]

## DISCUSSION

Defendants seek dismissal or summary judgment on the grounds that (1) the complaint fails to state a claim against Wexford because there is no vicarious (respondeat superior) liability under 42 U.S.C. § 1983; and (2) Dent fails to demonstrate that the defendants committed an Eighth Amendment violation by exhibiting "deliberate indifference" to a "serious illness or

---

[16] Dent's subsequent complaints concerning post-surgical follow up and physical therapy are not at issue in this case.

injury." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

## I.     Wexford and Gilmore

Wexford's argument that the complaint fails to state a claim against it because there is no respondeat superior liability under 42 U.S.C. § 1983 is properly construed as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).   Additionally, the defendants assert that Dent makes no claim against Gilmore except to allege that, as "Medical Supervisor," she is legally responsible for the overall operation of the medical department.   (Compl. 2.)   Dent does not allege that Gilmore personally provided medical treatment to him or had final policymaking authority with regard to his medical care.   For the reasons set forth below, the court will grant the motion to dismiss as to Wexford and Gilmore.

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Legal conclusions or conclusory statements do not suffice. *Id*. The court must consider the factual allegations in the complaint as true, and construe them in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005). Pro se complaints must be liberally construed and are held to a less stringent standard than documents drafted by attorneys.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle*, 429 U.S. at 106).

Dent asserts Wexford is liable because it has contracted with the State of Maryland to provide medical services to inmates.   (Compl. 2; Resp. Opp'n Mem. Law 1, ECF No. 22-1.) Dent avers that Wexford is "legally responsible for the overall operation of the medical

department under its jurisdiction, including [Ottey, Barrera, and Mahler]." (Compl. 2.) Wexford counters that Dent has failed to state a claim against Wexford because his claim is premised on a theory of vicarious (respondeat superior) liability, which does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). In his opposition, Dent acknowledges Wexford "cannot be held liable based on the principles of respondent [sic] superior." (Resp. Opp'n Mem. Law 7.) Instead, he maintains Wexford is liable for "violating the contract under which he, as a state prisoner, is guaranteed [] comprehensive medical care and also, alternatively . . . for imposing policies on it's [sic] employees to follow, policies that deny him proper medical treatment." (*Id.*)

Under 42 U.S.C. § 1983, individuals may sue in federal court a person who violates their federally protected rights while acting under the color of law. The Supreme Court, in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), concluded that local government entities are considered "persons" for the purposes of § 1983, but they cannot be held liable on a respondeat superior theory of liability solely because they employ an individual who committed an unlawful act. *Id.* at 690-91. Local government entities can only be sued if the constitutional violation alleged results from a custom or policy. *Id.* at 691. These standards also apply to private companies that employ individuals acting under color of state law. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999). Corporations are liable under § 1983 "*only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Id.* at 728 (emphasis in original).

Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries

they inflict on those committed to their care.'"   *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.

2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).   Supervisory liability under

§ 1983 must be supported with evidence that: (1) the supervisor had actual or constructive

knowledge that his subordinate was engaged in conduct that posed "a pervasive and

unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) the supervisor's

response to that knowledge was so inadequate as to show "deliberate indifference to or tacit

authorization of" the alleged offensive practices; and (3) there was an

"affirmative causal link" between the supervisor's inaction and the particular constitutional

injury suffered by the plaintiff.   *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).   Dent

concedes in his opposition that he provides no basis to hold Wexford liable on the grounds of

supervisory liability.   (Resp. Opp'n Mem. Law 7.)    He also fails to demonstrate that Gilmore

personally participated in his care or knew of the decisions regarding his care such that she could

be liable on grounds of supervisory liability.   Consequently, the claims against Wexford and

Gilmore will be dismissed.[17]

To the extent Dent contends the medical care he was provided was in breach of the

contract entered between the State of Maryland and Wexford, (*id*.), this new claim is vague and

conclusory.   Further, Dent, who is not a party to the state contract with Wexford, fails to show he

has standing to assert a claim against Wexford based on the contract.

## II.   Ottey, Barrera, and Mahler

The remaining defendants seek dismissal of, or summary judgment on, Dent's claim that

the medical treatment they provided amounted to "deliberate indifference" to his serious medical

needs and thereby violated his Eighth Amendment rights. Because both Dent and the defendants

---

[17]   To the extent Dent's claims might be read to imply that the care about which he complains was a result of
Wexford's policy or practice, that is refuted by Ottey's and Barrera's affidavits stating that the health care they
provided was a result of their independent medical judgment.  *See infra*, at 19.

have submitted evidence for the court's review, the motion will be construed as a motion for summary judgment for purposes of Dent's Eighth Amendment claim. *See* Fed. R. Civ. P. 12(d).

Under Federal Rule of Civil Procedure 56(a), the court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may rely on facts supported in the record, but not bare allegations. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (internal quotation marks and citation omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle*, 429 U.S. at 104; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A deliberate indifference claim consists of two components, objective and subjective. *Jackson*, 775 F.3d at 178. Objectively, the inmate's condition must be "serious," or "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity

for a doctor's attention." *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)); *see also Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam) ("Questions of medical judgment are not subject to judicial review."). Subjectively, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (emphasis in original).

If a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995); *see also Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). "A prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence . . . ." *Makdessi*, 789 F.3d at 133. Of import here, disagreements between an inmate and a medical provider about the proper course of treatment do not establish an Eighth Amendment violation absent exceptional circumstances. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285, 1286 (4th Cir. 1979) (per curiam) (A doctor's "failure to exercise sound professional judgment [does] not constitute deliberate indifference to serious medical needs."). Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice. The right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48

(4th Cir. 1977).  Moreover, "any negligence or malpractice on the part of the doctors in missing the diagnosis does not, by itself, support an inference of deliberate indifference."  *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998).[18]

The defendants do not dispute that Dent's medical condition is serious and painful.  They deny, however, that they acted with "deliberate indifference" to his serious medical needs.  Rather, they claim they have provided him with ongoing, conservative care for his conditions.  Most recently, he underwent knee surgery for his torn meniscus.

Dent claims Barrera acted to deny and delay the MRI of his left knee and back.   He claims Barrera was acting under Wexford policy by offering a "stabilizing medical treatment."  (Resp. Opp'n Mem. Law 5.)  Dent claims Barrera admitted to him that Wexford policy permitted Barrera to treat only one problem at a time.  (*Id.*)  In other words, the left knee would not be treated until his back problem was addressed; the only treatment Barrera could offer for the left knee was medicine to alleviate the pain, as well as physical therapy.  According to Dent, Barrera admitted to him that Wexford looks at an inmate's release date when considering payment for treatment, and recommended that Dent contact an attorney to assist him in obtaining treatment.  (*Id.*)  Dent also alleges that, on January 7, 2015, when Barrera discussed the lumbar spine MRI with Dent, Barrera told Dent he would not be approved for back surgery even if the surgeon said it was necessary.  *Id.*[19]

Ottey and Barrera deny these claims in their affidavits.  (*See* Ottey Suppl. Aff. ¶¶ 9, 10;

---

[18] Dent has submitted with his opposition an e-mail from Jonathan Guice, a "Spine Care Consultant" at the Laser Spine Institute in Tampa, Florida, stating that a review of Dent's MRI suggested he may be a "potential candidate" for a "minimally invasive spinal procedure[]."  (ECF No. 22-9.)  Guice's competence to render such information is unknown to this court; Guice does not identify himself as a medical doctor or specify what training he has received.  Further, the e-mail explained that the specific type of procedure or exact surgical recommendation could only be determined after a complete physical examination is performed.  (*Id.*)  Finally, to the extent Dent offers this e-mail to support his claim of an Eighth Amendment violation, the fact that an alternative course of treatment may be available does not prove deliberate indifference.

[19] These allegations are not set forth in affidavits.

Barrera Aff. ¶¶ 4-13, ECF No. 25-4.)  Ottey attests he is employed by Wexford as the Medical

Director at WCI and RCI:

> In Affiant's opinion to a reasonable degree of medical probability, Plaintiff's treating medical [providers] have appropriately managed Plaintiff for his lower back and left knee pain including placing Plaintiff on pain medication, muscle relaxers, providing Plaintiff with bottom-bunk status, providing Plaintiff with a knee brace and cane, physical therapy, x-rays, sending Plaintiff to a tertiary orthopedic specialist and for off-site MRIs.
>
> It is Affiant's opinion to a reasonable degree of medical probability that the conservative treatment for Plaintiff's knee provided before recommending arthroscopic surgery was appropriate and within the applicable standard of care.
>
> It is Affiant's opinion to a reasonable degree of medical probability that Dr. Barrera's determination, upon reviewing the January 5, 2015 MRI of Plaintiff's lumbar spine, that lumbar surgery was not indicated for Plaintiff was medically appropriate and within the applicable standard of care. Furthermore, it is Affiant's opinion to a reasonable degree of medical probability that the conservative care provided for Plaintiff's back was medically appropriate and within the applicable standard of care.

(Ottey Suppl. Aff. ¶¶ 1, 8-10.)

Further, Ottey states that Dent continues to be seen regularly as a chronic care inmate

and may seek more immediate medical attention through the sick call process.  (Ottey Aff. ¶ 44.)

Barrera is employed by Wexford to provide medical services to WCI inmates.  (Barrera

Aff. ¶ 1.)  Barrera attests:

> Affiant has personally evaluated Plaintiff and is familiar with the allegations raised by Plaintiff in his Opposition to the Medical Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment that: 1) Wexford maintains a policy of simply providing "stabilizing medical treatment" for prisoners with injuries; 2) that Affiant admitted to Plaintiff that Wexford alters the treatments it provides based on an inmate's release date; 3) that Affiant instructed Plaintiff to contact an attorney to receive the medical care Plaintiff is entitled to; and 4) that Affiant informed Plaintiff that he would not receive spinal surgery even if a specialist recommended it.
>
> ***********
> Wexford does not maintain a policy of providing "stabilizing medical treatment" for injured inmates. All inmates receive medical care based on

> their treating medical providers' independent medical judgments based on the inmates' individual needs.
>
> \*\*\*\*\*\*\*\*\*\*\*
>
> Wexford does not maintain a policy of determining what treatments a prisoner will receive based on his or her release date.
>
> \*\*\*\*\*\*\*\*\*\*\*
>
> Affiant never "admitted to plaintiff that [Wexford] also takes a look at [a prisoner's] release date when considering payment for treatment."

(*Id.* ¶¶ 2, 4, 5, 7 (alteration in original).)

Further, Barrera denies in his affidavit suggesting that Dent contact an attorney in order to obtain medical care, or telling Dent that no spinal surgery would be performed even if a surgeon recommended it.  (*Id.* ¶¶ 8, 9.)  Barrera attests that, based on his review of the MRI of Dent's lumbar spine, surgery was not required and, instead, a conservative course of treatment was appropriate.  (*Id.* ¶¶ 12, 13.)

The record shows that Mahler and Barrera were diligent in providing treatments to address Dent's complaints of back and left knee pain.  Mahler, for example, ordered x-rays of Dent's spine and knee, (ECF No. 1-18, at 1, 3); followed up with the pharmacy department when Dent complained he had not yet received his medication, (Sealed Ex. 1, at 12); changed Dent's prescription when his other pain medications upset his stomach, (*id.* at 19, 21, 22); and contacted Carls's office when there was no order in Dent's EPHR for an MRI, (*id.* at 31).   Barrera referred Dent to physical therapy when he showed symptoms of a herniated disc, (ECF No. 1-21, at 1); ordered an orthopedic consultation with Carls, (Sealed Ex. 1, at 26-27); submitted requests for MRIs of Dent's spine in October 2014, and his knee in September 2014, October 2014, November 2014, January 2015, and February 2015, (*id.* at 33-34, 37, 51-52, 61-62, 101); and ordered a large knee brace for Dent, (*id.* at 54).  There is no genuine dispute of material fact that Mahler and Barrera did not display deliberate indifference to Dent's medical needs.  Therefore,

the defendants' motion for summary judgment will be granted as to Mahler and Barrera.

The court, however, will deny without prejudice the motion for summary judgment as to Ottey.  In finding Dent's ARP to be meritorious, the WCI acting warden said that the consults for MRIs of Dent's left knee and spine were placed on hold "pending review with the Regional Medical Director [RMD]." (ARP Request 1.)  According to the ARP, the RMD saw Dent on November 4, 2014, and placed the MRI consults on hold pending a two-week trial of steroids. (*Id.*)  The records confirm that Ottey saw Dent on November 4, 2014, and prescribed him a trial course of steroids.  (Sealed Ex. 1, at 35.)  The suggestion, therefore, is that Ottey was responsible for approving or denying the MRIs, and for addressing Dent's "need for additional medical treatment." (ARP Request 1.)  Carls recommended an MRI of Dent's spine and potentially arthroscopic surgery on Dent's knee in October 2014. (Sealed Ex. 1, at 107.)  Also in October 2014, Barrera submitted a request for MRIs of Dent's spine and left knee. (*Id.* at 33; *see also* ARP Request 1.)  Dent was approved for MRIs of both his left knee and spine as of December 17, 2014, and an MRI of Dent's spine was performed on January 5, 2015. (Sealed Ex. 1, at 46; Ottey Aff. ¶ 26.)  But the MRI of Dent's knee was not performed until July 2015, only after Barrera had twice—and three other medical providers had each once—renewed requests for the MRI.  (Sealed Ex. 1, at 51, 61-62, 77, 85, 101, 105; Ottey Aff. ¶ 43.)  The defendants have provided reasons for why immediate surgery of Dent's meniscus tear may not have been medically appropriate, (see Mot. Dismiss Mem. Law 7-8), and why conservative treatment for Dent's back was within the applicable standard of care, (*id.* at 23), but they have not provided an explanation for the delay of the MRI of Dent's knee.  The fact that Dent has since had surgery on his knee does not explain away the months-long wait he endured for that MRI, which appears to have been a prerequisite for obtaining surgery.  As one of his treating physicians, Ottey knew of

Dent's pain and medical needs.  Therefore, the defendants have not provided enough information for the court to conclude that Ottey was not deliberately indifferent to Dent's serious medical needs.  The motion for summary judgment as to Ottey will be denied without prejudice.

**CONCLUSION**

For the foregoing reasons, the defendants' motion will be granted in part and denied in part.  The claims against Wexford and Gilmore will be dismissed for failure to state a claim.  Summary judgment will be entered in favor of Mahler and Barrera, and denied without prejudice as to Ottey, subject to renewal in sixty days.  A separate order follows.


March 17, 2016_____                    _____/s/_____
Date                                    Catherine C. Blake
                                        United States District Judge