IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROBERT DENT, # 352230 | * | |
| | * | |
| v. | * | Civil Action No. CCB-15-206 |
| | * | |
| WEXFORD HEALTH SOURCES, INC. | * | |
| JANICE GILMORE | * | |
| COLIN OTTEY | * | |
| PEGGY MAHLER | * | |
| ROBUSTIANO BARRERA, M.D. | * | |
| | * | |
| | ***** | |

## MEMORANDUM

On January 22, 2015, Robert Dent ("Dent"), an inmate housed at the Western Correctional Institution ("WCI") filed suit under 42 U.S.C. §1983, alleging that defendants Wexford Health Sources, Inc. ("Wexford"), Janice Gilmore, Colin Ottey, M.D., Peggy Mahler, RNP, and Robustiano Barrera, M.D., violated his rights under the Eighth Amendment to the United States Constitution by providing him inadequate medical treatment for "excruciating" pain in his left knee and pain in his lower back, even though he submitted a number of complaints beginning in 2011. He complains that he was diagnosed with a meniscus tear to his knee and recommended for a Magnetic Imaging Resonance ("MRI") test, but he was not provided such a diagnostic test or referred to an orthopedic specialist. Dent states that instead he was referred to physical therapy and provided pain analgesics, which is not alleviating his discomfort. He seeks injunctive and declaratory relief, as well as compensatory, punitive, and miscellaneous damages. (Compl. 5–6, ECF No. 1.)

Defendants' prior motion to dismiss or, in the alternative, motion for summary judgment was granted in part and denied in part. (Mem. Op., ECF No. 34; Order Granting in Part and Den.

In Part Mot. to Dismiss, ECF No. 35.) The complaint against Wexford and Gilmore was dismissed, the court finding that Dent had failed to set out a complaint against either of those two defendants. Further, summary judgment was entered in favor of defendants Mahler and Dr. Barrera, the court concluding that neither defendant demonstrated deliberate indifference to Dent's needs. The motion for summary judgment was denied without prejudice as to Dr. Ottey, subject to renewal in sixty days. (Mem. Op., at 21.) The court found that there was a substantial gap between the diagnosis of Dent's torn meniscus and his receipt of an MRI and surgery, and, as the Medical Director in the Western Maryland prison region, Dr. Ottey was required to file supplemental materials to explain the reasons for the one-year interval. (*Id*. at 20.)

On May 31, 2016, Dr. Ottey filed a supplemental motion for summary judgment, accompanied by a motion to seal.[1] (Suppl. Mot. for Summ. J., ECF No. 39; Mot. to Seal by Colin Ottey, ECF No. 40.) Dent has filed oppositions (Pl. Resp. in Opp'n to Suppl. Mot. for Summ. J., ECF No. 42), to which Dr. Ottey has replied (Reply in Supp. to Suppl. Mot. for Summ. J., ECF No. 44.) The case is fully briefed and ripe for disposition. No hearing is necessary to resolve the issues. *See* Local Rule 105.6 (D. Md. 2016). For reasons that follow, summary judgment will be GRANTED as to Colin Ottey.

## BACKGROUND

### A. Treatment History

Dent's treatment history at WCI is well documented in this court's March 17, 2016, Memorandum and Order and shall be reexamined here. (Mem. Op., at 2–11). He is now a fifty-five year old inmate with a medical history significant for lower back pain and left and right leg pain, as well as shoulder pain. (Compl. 2, ECF No. 1.) The exhibits reveal that as early as March

---

[1] Defendant Ottey's motion to seal shall be granted. The supplemental motion for summary judgment and exhibits (Suppl. Mot. for Summ. J., ECF No.39; Mot. to Seal by Colin Ottey, ECF No. 40), contain sensitive records and information regarding Dent's medical history. The Clerk shall place both documents under seal in their entirety.

of 2011, Dent raised concerns of knee pain and lower back pain. (ECF No. 1-11, at 1; Ottey Aff. ¶ 1, ECF No. 18-4.)[2] He was examined by a physician's assistant ("PA"), who found a decrease in Dent's lumbar mobility and his spine was positive for posterior tenderness.[3] (ECF No. 1-12, at 1.)

On December 24, 2011, Dent was seen for complaints of bilateral leg pain. (ECF No. 22-8, at 1.) He explained he was hit in the back playing basketball and his legs went numb, causing him to fall on the floor. (*Id*.) Dent complained that the bottom of his feet were tender. (*Id*.) Dent was told to continue his medication regimen, which included aspirin and an anti-inflammatory, and to avoid work or yard activity that day. (*Id*. at 1–2).

Defendants assert that Dent raised no complaints of back or leg pain between January 1, 2012 and January 22, 2014.[4] (Mot. Dismiss Mem. Law 3, ECF No. 18-1.) He complained of leg pain on January 28, 2014. (ECF No. 1-17, at 1.) He was evaluated and the report indicated that Dent complained of suffering *right leg* pain for six months. (*Id*. (emphasis added).) Dent described the pain as an ache that was worse in the morning and gradually improved throughout the day. (*Id*.) Dent stated he had arthritis, and described his pain as moderate. (*Id*.) It was noted that Dent's condition was stable and improved with NSAIDs.[5] (*Id*.) Dent was prescribed Naprosyn[6] and stretching exercises were recommended. (*Id*.)

On March 7, 2014, Dent was examined for chest and right knee discomfort. (Sealed Ex. 1, at 3-4.) It was observed Dent had no knee swelling, his gait was normal, and he was able to

---

[2] Ottey's medical report indicates Dent complained of right leg, not left knee, pain. (*Id.* at 1.) Ottey indicated x-rays were ordered. (*Id.* at 3.)
[3] Any contact between Ottey and Dent will be specifically referenced in the opinion.
[4] In November 2013, however, Dent presented complaints about left knee and mid-back pain during a medical visit. (ECF No. 1-16, at 1.)
[5] Nonsteroidal anti-inflammatory drugs (NSAIDs) are prescribed to treat pain. *See* Pain Relievers, MedlinePlus, https://www.nlm.nih.gov/medlineplus/painrelievers.html (last updated Feb. 21, 2017).
[6] Naprosyn (Naproxen) is an NSAID. *See* Genentech, Medication Guide for Non-Steroidal Anti-Inflammatory Drugs (NSAIDs) 30 (2010), http://www.fda.gov/downloads/Drugs/DrugSafety/ucm085911.pdf.

bear full weight. (*Id*. at 3.) He was instructed to submit a sick-call slip if his symptoms failed to improve. (*Id*. at 4.)

On April 28, 2014, Dent was seen for his complaints of left knee and lower back pain. (ECF No. 1-18, at 1.) The medical report indicates "left knee pain" as a reason, among others, for the medical visit. (*Id*.) The report, however, referenced Dent's reported intermittent "right knee pain" which improved with Motrin 800 mg. (*Id*.) Dent reported his back pain had started two years earlier while playing handball. (*Id*.) He stated he was about to begin physical therapy, but before it started, he was transferred to WCI. (*Id*.) Dent stated that he believed he had a nerve issue in his back. (*Id*.) X-rays of Dent's lumbar spine were taken and the results showed no evidence of acute fracture, dislocation or subluxation. (*Id*. at 1, 3.) No acute disease was observed. (*Id*. at 4.) Mild degenerative changes were observed to the lumbar spine. (*Id*.)

On June 5, 2014, Dent received a physician's examination for complaints of left leg and back pain. (ECF No. 1-21, at 1.) He reported pain shooting down his leg. (*Id*.) The doctor noted Dent's reported history of a 2011 sports injury to his back. (*Id*.) Dent reported that injury had resulted in almost immediate weakness in both legs, and he was taken to the emergency room. (*Id*.) He claimed that his leg function gradually returned, but he continued to experience left leg pain. (*Id*.) Dent told the doctor that his back pain had since returned. (*Id*.) While lifting weights, Dent had momentarily lost control of both legs. (*Id*.) The physician indicated that Dent showed clinical symptoms of a herniated disc, and referred him for physical therapy. (*Id*.)

On June 15 and June 30, 2014, Dent was seen for his medication concerns. (Sealed Ex. 1, at 10–12.) He claimed he had not been placed on a muscle relaxer, as ordered (*id*. at 10), and

he had not received the Baclofen[7] prescribed for him.  (*Id*. at 12.)  The pharmacy department indicted that Dent would be added to the Baclofen medication list that day.  (*Id*.)

On July 9, 2014, Dent was seen by a physician for a scheduled provider visit to re-evaluate his need for ongoing physical therapy.  (*Id*. at 13–14.) Dent reported "significant improvement" regarding his back and leg pain, although he presented complaints of left knee pain with tenderness.  (*Id*.)  The physician noted that the symptoms were compatible with tendinitis and that Dent's straight leg raising was mostly corrected.  (*Id*.)  Based on his medical findings, the doctor recommended that Dent continue physical therapy.  (*Id*.)  Dent was approved for additional physical therapy.  (*Id*. at 15.)

On July 30, 2014, Dent was examined by another doctor during a chronic care visit related to his arthritis, among other issues.  (*Id*. at 16–17.)  He complained that NSAIDs made him ill.  (*Id*. at 16.)  Dent's medications were renewed and he was prescribed Tylenol No. 3.[8]  (*Id*. at 17.)  On August 1, 2014, however, Dr. Ottey discontinued the Tylenol No. 3 prescription and prescribed Tylenol Extra Strength for arthritis instead.  (*Id*. at 18.)

On August 19, 2014, Dent was seen by a nurse for a physical examination.  (*Id*. at 19–22.)  He reported suffering pain in his left knee for one-and-a-half years, and indicated that he had injured his left knee playing handball in 2011.  (*Id*. at 19.)  He was prescribed Mobic[9] and received a recommendation to avoid exercises that placed pressure on the knee.  (*Id*. at 19, 24.)

On August 27, 2014, a physician examined Dent for complaints of knee pain.  (*Id*. at 25.) Dent reported improvement with physical therapy.  (*Id*.)  The doctor noted tenderness, but no

---

[7]  Baclofen is a medication prescribed for pain relief and to improve muscle movement. *See* Baclofen Oral, MedlinePlus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (last updated Feb. 23, 2017).
[8] Tylenol No. 3 is a combination of Tylenol and codeine (an opiate) used to treat pain.  *See* Tylenol with Codeine, DailyMed, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=936e481e-f46c-4e03-b8e3-25961cda1909 (last updated Jan. 24, 2017).
[9]  Mobic is a NSAID used to treat pain or inflammation.  *See* Medication Guide for Non-Steroidal Anti-Inflammatory Drugs (NSAIDs), http://www.fda.gov/downloads/Drugs/DrugSafety/ucm088646.pdf.

swelling in the left knee. (*Id.*) He opined that there was a possible meniscus tear in the left knee[10] and possible degenerative disc disease in the spine. (*Id.*) The doctor increased Dent's Baclofen prescription and recommended continuing physical therapy. (*Id.*)

On September 18, 2014, a physician ordered an MRI of the left knee due to Dent's continuing left knee pain. (*Id.* at 26.) Noting Dent's reports were clinically consistent with a meniscus tear, the physician additionally ordered an orthopedic consultation with Roy Carls, M.D., an orthopedist practicing with Memorial Hospital Orthopedics. (*Id.* at 26–27, 95; Mot. Dismiss Mem. Law 8 n.11.) On September 26, 2014, Dent's non-formulary Mobic prescription was approved. (Sealed Ex. 1, at 28.)

On October 3, 2014, Roy J. Carls, M.D., examined Dent. (*Id.* at 107.) He reported that Dent had tenderness in the posterior medial knee joint, but otherwise had a stable ligamentous exam. (*Id.*) He observed that Dent was suffering from sciatica-type symptoms, causing pain and numbness in his left leg. (*Id.*) He noted that Dent's left knee had an obvious medial meniscus tear and recommended outpatient surgery. (*Id.*) Dr. Carls also recommended that Dent receive an MRI of the spine for diagnostic purposes as it is "likely he has a large disc." (*Id.*)

On October 20, 2014, a physician discussed Dr. Carls's orthopedic consultation results with Dent. (Sealed Ex. 1, at 33–34.) Noting that Dr. Carls had agreed with his diagnosis of a left meniscus tear and lumbar spinal disc disease, the physician stated he would submit a request for an MRI of Dent's lumbar spine and left knee. (*Id.* at 33.) He opined that the MRI of the left knee would assist in determining the nature and severity of the tear and if surgery should be part of Dent's individualized treatment plan. (*Id.*)

---

[10] "A torn meniscus is damage from a tear in the cartilage that is positioned on top of the tibia and allows the femur to glide when the knee joint moves." (Ottey Aff. ¶ 15.)

On November 4, 2014, Dr. Ottey examined Dent and noted no weakness to his gait and found his balance and reflexes normal. (*Id*. at 35.) He recommended implementation of conservative care with a trial of steroids and increased his Baclofen, pending completion of the requesting imaging studies. (*Id*.) On November 17, 2014, Dent reported to another physician that his left knee and lumbosacral pain were continuing. (*Id*. at 37–38.) The doctor noted the possibility of arthroscopic surgery, and that Dent would need an MRI of his left knee. (*Id*. at 37.) The physician noted that Dent had been placed on a two-week course of steroids, by a "collegial" recommendation,[11] which proved ineffective. (*Id*.)

On December 17, 2014, Dent was approved for an MRI of his left knee and spine. (ECF No. 22-5.) The MRI of the lumbar spine was performed on January 5, 2015. (ECF No. 22-6.) A mild loss of signal was noted at the L4-L5 and L5-S1 levels due to degenerative changes. (*Id*.) The MRI found a very small disc herniation on the right side at the L1-L2 interspace with no other disc herniation or spinal canal stenosis. (*Id*.) Very mild bulging was noted over the L4-L5, and L5-S1 disc. (*Id*.) No MRI was conducted on the left knee. (*Id*.)

On January 7, 2015 Dent was seen by a physician to discuss the spinal MRI results. (Sealed Ex. 1, at 51-52.) The doctor indicated surgery was not needed and a conservative course of treatment would continue. (*Id*. at 51.) Dent complained he was suffering significant left knee pain, causing him to limp. (*Id*.) He also complained that his left leg gave out frequently, especially when descending stairs. (*Id*.) Dent also reported the soft knee brace provided by the physical therapist was not helpful. (*Id*.) The doctor requested an MRI of Dent's left knee and indicated on the medical chart that another consultation with Dr. Carls may be needed. (*Id*.)

Dent was approved for a knee brace on January 15, 2015. (*Id*. at 54–55.) On January 21,

---

[11] Although the record implies that Dr. Carls recommended the two-week steroid treatment, the court finds nothing in the record from Dr. Carls's October 3, 2014 consult that suggests that such a recommendation was made. (ECF No. 19-2, at 107.)

7

2015, the same physician ordered a different knee brace for Dent. (*Id*.) On January 22, 2015, Dent was seen by the same doctor in the chronic care clinic for several health concerns, including knee pain. (*Id*. at 56–58.) It was recommended that Dent continue taking Mobic and Baclofen. (*Id*. at 58.) Dent was seen by healthcare staff on February 11 and February 12, 2015 for his history of left knee pain. (*Id*. at 59–70.) He received a knee brace and an MRI was ordered for his left knee. (*Id*. at 61–62, 101.) It was observed that Dent would likely require a repair of his meniscus. (*Id*.)

On March 30, 2015, Dent was transferred to the Roxbury Correctional Institution ("RCI"). (Sealed Ex. 1 128, ECF No. 19-2.) On April 9, 2015, he was seen by a PA who ordered Dent a new knee brace, continued Dent on his medication, and placed him in the pain management chronic care clinic. (Sealed Ex. 1, at 70.) The following day, Dent was provided with a new knee brace. (*Id*.) On April 13, 2015, the PA submitted a request for orthopedic evaluation for Dent's complaints of back pain and an MRI of his left knee. (*Id*. at 71, 103, 105.)

On May 11, 2015, Dent presented complaints of lower back pain and left knee pain. (*Id*. at 72.) He indicated that the Mobic was effective. (*Id*.) The PA prescribed Gabapentin and ordered a cane for him. (*Id*. at 72, 73, 74.) Dent was issued a cane on May 18, 2015. (*Id*. at 76.)

On June 2, 2015, a physician submitted a request for Dent to be seen for a telemedicine conference in regard to his left knee and back pain. (*Id*. at 77–78; *see also* Ottey Suppl. Aff. ¶ 6, ECF No. 25-3.) The physician also requested an MRI of Dent's left knee. (Sealed Ex. 1, at 77).

On July 1, 2015, a physician saw Dent for his chronic pain. (*Id*. at 79–82.) A consultation request was made for Dent to be seen by the Utilization Management doctor for a conference. (*Id*. at 79, 80, 82.) The doctor renewed Dent's medications. (*Id*. at 80–81.) On July 26, 2015, a nurse examined Dent. (*Id*. at 85–86.) He observed Dent walked with a cane and a

slight limp, but did not appear to be in acute distress.  (*Id*. at 85.)  Dent reported his knee and back pain were causing him to lose sleep, the pain was radiating to both legs, and he could not perform some of his exercises.  (*Id*.)  The nurse indicated that Dent had been waiting for an MRI of his left knee since June 2015 and referred him back to provider to make sure the MRI was scheduled.  (*Id*.)

On July 28, 2015, Dent was sent to Bon Secours Hospital ("BSH") for an MRI of his left knee.  (Ottey Aff. ¶ 43.)  A horizontal tear of the posterior horn of the medial meniscus was observed.  (*Id*.)  Dent was referred to an orthopedist for further examination and development of a treatment plan.  (*Id*.)

On August 25, 2015, a physician saw Dent via a telemedicine conference and approved him for surgery to repair the torn meniscus.  (Ottey Suppl. Aff. ¶ 6.)  Because the surgery was not of an emergency nature, it was scheduled according to prison policy for off-site medical visits and the schedule of the orthopedic surgeon.  (*Id*.)  On August 26, 2015, a request was submitted for an orthopedic consultation to repair the meniscal tear.  (ECF No. 25-2.)  It was noted that the request had been approved.  (*Id*.)  On October 22, 2015, Dent underwent surgery on his left knee to repair a torn meniscus.  (Dec. 2015 Dent Correspondence 1, ECF No. 28; Feb. 2016 Dent Correspondence 1, ECF No. 31.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Whether a fact is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, "the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id*. at 247–48. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir.2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Dewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either

provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.[12] *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Corr. Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (noting that focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)). Inmates do not have a constitutional right to the treatment of their choice, *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury. *See Estelle*,

---

[12] A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

429 U.S. at 105–06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Fleming v. LaFevere*, 423 F.Supp.2d 1064, 1070–71 (C.D. Cal. 2006).

In his supplemental summary judgment motion, Dr. Ottey acknowledges Dr. Carls's October 2014 diagnosis of a meniscus tear and lumbar spinal disease, as well as his recommendation for an MRI of Dent's spine and left knee. (Suppl. Mot. for Summ. J. 4; Ottey Suppl. Aff. ¶ 7, ECF No. 39-3.) He seemingly argues, however, that the Department of Public Safety and Correctional Services ("DPSCS") procedure for specialty care, which includes MRI imaging, surgery, and specialist evaluations, mandates that the specialty care must be presented for review and approval to a utilization review physician. (Ottey Suppl. Aff. at ¶ 9.) Dr. Ottey affirms that a consult request was made by a WCI physician on October 30, 2014, to seek a consultation with a Utilization Management ("UM") physician, Dr. Asresahegn Getachew. (*Id*. at ¶ 10.) Dr. Getachew requested additional clinical information. (*Id*.) Dr. Ottey maintains that the plan was to evaluate Dent's ability to ambulate before a decision could be made on the MRI requests. (*Id*.)

Dr. Ottey affirms that he saw Dent on November 4, 2014, related to his left knee and lower back. (*Id.* at ¶ 11.) He states that he evaluated Dent's lumbar pain and discussed his symptoms. (*Id*.) Dr. Ottey noted that upon examination, Dent's left knee displayed tenderness, but he observed no weakness and found Dent's gait, balance and reflexes to be normal. (*Id*.) Pending approval of Dent's requested imaging studies, Dr. Ottey recommended conservative care with a trial of steroids, a follow-up visit in two weeks, and an increase in Dent's Baclofen prescription. (*Id*.) On November 7, 2014, Dr. Ottey recommended the UM physician approve placing Dent on steroid therapy as a conservative measure, before ordering an MRI of Dent's knee. (*Id*. at ¶ 12.) In addition, Dent would be reevaluated for his pain after a trial of an

increased dose of Baclofen. (*Id.*)

On November 17, 2014, Dent was seen by a WCI physician for a provider visit related to back and knee pain. (*Id.* at ¶ 13.) It was observed that Dent had obtained no improvement with the two weeks of steroid treatment. (*Id.*) The doctor recommended an MRI of the left knee. (*Id.*) On December 18, 2014, Dent's case was presented to the UM physician in "collegial review" by Dr. Ottey. (*Id.* at ¶ 18.) The doctor approved Dent's lumbar spine MRI. (*Id.*) Dr. Ottey affirms that a decision on Dent's left knee remained pending to determine whether he would benefit from the round of steroid injections in his left knee. (*Id.*)

On January 5, 2015, Dent received an MRI of his lumbar spine. (*Id.* at ¶ 21.) The results are noted herein.[13] Dent was seen by a WCI physician two days later. (*Id.* at ¶ 22.) It was determined that he did not require surgery for his lower back issues and he was to continue on conservative treatment. (*Id.*) The doctor noted that Dent was limping constantly, had been diagnosed with a meniscus tear, and an MRI had been suggested. (*Id.*) A consultation was placed for an MRI of Dent's left knee. (*Id.*) Dent's case was again addressed in collegial review on January 15, 2015. (*Id.* at ¶ 23.) At that time he was approved for a knee brace to "normalize [his] gait pattern and [to] immobilize the knee to promote healing, stability and improve function of the knee." (*Id.*)

Dent was seen by healthcare staff at WCI throughout January and February of 2015. (*Id.* at ¶¶ 25–29.) It was observed that he was receiving Mobic, which afforded him temporary relief from the pain, and that he had been provided a knee brace. (*Id.* at ¶¶ 25–26.) On February 12, 2015, he was seen by a physician, who ordered an MRI for Dent's left knee. (*Id.* at ¶ 27.) The physician placed a consultation form for Dent to be seen by the orthopedist. (*Id.*) On February 18, 2015, the UM review physician was presented a request for an MRI of Dent's left knee by

---

[13] *See supra* p. 7, ¶ 3.

Dr. Ottey.  (*Id*. at ¶ 29.)  The UM physician approved physical therapy and the continued use of a knee brace for Dent.  (*Id*.)  Dent continued his physical therapy throughout March 2015, when physical therapy staff determined that he should be discharged and continue his home plan of care exercises.  (*Id*. at ¶ 31.)   On March 30, 2015, Dent was transferred to RCI.  (*Id*. at ¶ 32.)

In April 2015, a request for an MRI of Dent's left knee was reviewed by the UM doctor.  (*Id*. at ¶ 35.)  It was recommended that Dent be seen by the physician via telemedicine before an MRI would be approved for Dent's left knee.  (*Id*.)  Dent was provided a cane to assist with ambulation.  (*Id*. at ¶ 36.)  On July 7, 2015, Dent was approved for an MRI of his left knee.  (*Id*. at ¶ 37.)  Dent received an MRI of his left knee on July 28, 2015.  (*Id*. at ¶ 38.)  A horizontal tear of the posterior horn of the medial meniscus was observed.  (*Id*.)  Dent received surgery for his meniscus tear on October 22, 2015 at BSH.  (*Id*.)

Dr. Ottey affirms that his responsibility was limited to presenting "consultation requests to the UM review board."  (Suppl. Mot. for Summ. J. 11.)  He maintains that the conservative care provided to Dent between November, 2014, and July, 2015, was medically appropriate and within the applicable standard of care.  (*Id*.)

Plainly there was an extensive interval of time between the implicit diagnosis of a torn meniscus by Dr. Carls in September, 2014, and Dent's receipt of an MRI and surgery in July and October, 2015.  The question for the court is whether such a delay demonstrates "deliberate indifference" in light of the conservative care Dr. Ottey claims Dent was provided.  *Estelle*, 429 U.S. at 106.  There is no dispute that in the interim period of time between diagnosis and the MRI, Dent was afforded physical therapy, knee braces, pain analgesics, a cane, and steroid injections into his knee, all of which appear reasonable in the treatment of a torn meniscus, according to the record.  That there is nothing about Dent's treatment that indicates Dr. Ottey

ignored or intentionally delayed medical care for Dent's knee problem. While Dent may be dissatisfied with the course of treatment and the health care professionals he saw, the conservative care he received for his left knee condition met the minimum constitutional requirements. No Eighth Amendment violation has been demonstrated.

## CONCLUSION

For the foregoing reasons, Defendant Ottey's supplemental motion for summary judgment will be granted. A separate order shall follow.


Date:  March 9, 2016                                         /S/
                                                    Catherine C. Blake
                                                    United States District Judge